UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

DEBORAH ANN GIZA,                          )
                                           )
     Plaintiff,                          )
                                           )
     v.                                  )     CAUSE NO. 2:20-cv-00263-SLC
                                           )
COMMISSIONER OF SOCIAL                     )
SECURITY, *sued as Kilolo Kijakazi*,       )
*Acting Commissioner of Social Security*,[1] )
                                           )
     Defendant.                          )

## OPINION AND ORDER

Plaintiff Deborah Ann Giza appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying her application under the Social Security Act (the "Act") for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (ECF 1). For the following reasons, each of Giza's arguments are persuasive, and thus, the Commissioner's decision will be REVERSED and the case REMANDED to the Commissioner for further proceedings in accordance with this Opinion and Order.

## I. FACTUAL AND PROCEDURAL HISTORY

Giza protectively applied for DIB on January 8, 2018, and for SSI on January 10, 2018, alleging disability as of June 1, 2017. (ECF 15 Administrative Record ("AR") 40, 236-45; 247-58). Her claim was denied initially and upon reconsideration. (AR 102-117, 120-37). After a timely request (AR 177-78), a hearing was held on April 29, 2019, before administrative law judge ("ALJ") Cindy Martin, at which Giza, who was represented by counsel, and a vocational

---

[1] Kilolo Kijakazi is now the Acting Commissioner of Social Security, *see, e.g.*, *Butler v. Kijakazi*, 4 F.4th 498 (7th Cir. 2021), and thus, she is automatically substituted for Andrew Saul in this case, *see* Fed. R. Civ. P. 25(d).

expert ("VE") testified.  (AR 63-101).  On June 28, 2019, the ALJ rendered an unfavorable

decision to Giza, concluding that she was not disabled because she could perform a significant

number of jobs in the economy despite the limitations caused by her impairments.  (AR 40-50).

Giza's request for review was denied by the Appeals Council (AR 1-4), at which point the ALJ's

decision became the final decision of the Commissioner, *see* 20 C.F.R. §§ 404.981, 416.1481.

Giza filed a complaint with this Court on July 14, 2020, seeking relief from the

Commissioner's decision.  (ECF 1).  In her appeal, Giza alleges that the ALJ:  (1) erred in

weighing the medical evidence, (2) improperly discredited Giza's symptom testimony, and (3)

erred in posing hypothetical questions to the VE.  (ECF 20).

At the time of the ALJ's decision, Giza was fifty-three years old (AR 49, 236, 247), had a

high school education (AR 49, 295), and had relevant work experience as an office clerk (AR 48,

289).  In her applications, Giza alleged disability due to restless leg syndrome, type 2 diabetes,

neuropathy, COPD, and a bulging disc in her back.  (AR 237, 294).

## II.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court the "power to enter, upon the pleadings and

transcript of the record, a judgment affirming, modifying, or reversing the decision of the

Commissioner . . . , with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

The Court's task is limited to determining whether the ALJ's factual findings are supported by

substantial evidence, which means "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion."  *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005)

(citation omitted).  The decision will be reversed "only if [it is] not supported by substantial

evidence or if the ALJ applied an erroneous legal standard."  *Clifford v. Apfel*, 227 F.3d 863, 869

(7th Cir. 2000) (citation omitted).  "Substantial evidence must be more than a scintilla but may be

2

less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (citations omitted).

To determine if substantial evidence exists, the Court "review[s] the entire administrative record, but do[es] not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Clifford*, 227 F.3d at 869 (citations omitted). "Rather, if the findings of the Commissioner . . . are supported by substantial evidence, they are conclusive." *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003) (citation omitted). "In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether [the claimant] is disabled, we must affirm the ALJ's decision denying benefits." *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

### III.  ANALYSIS

#### A.  The Law

Under the Act, a claimant seeking DIB or SSI must show an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).  A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence:  (1) whether the claimant is currently unemployed in substantial gainful activity, (2) whether she has a severe impairment, (3) whether her impairment is one that the Commissioner considers conclusively disabling, (4)

whether she is incapable of performing her past relevant work; and (5) whether she is incapable of performing any work in the national economy.[2] *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001) (citations omitted); *see also* 20 C.F.R. §§ 404.1520, 416.920.  An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled.  *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).  A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled.  *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner.  *Clifford*, 227 F.3d at 868.

### B.  The Commissioner's Final Decision

On June 28, 2019, the ALJ issued a decision that ultimately became the Commissioner's final decision.  (AR 40-50).  At step one, the ALJ concluded that Giza had not engaged in substantial gainful activity since June 1, 2017, her alleged onset date.  (AR 43).  At step two, the ALJ found that Giza had the following severe impairments:  lumbar degenerative disc disease, diabetes mellitus with diabetic neuropathy, carpal tunnel syndrome, COPD with continued cigarette use, obstructive sleep apnea, and restless leg syndrome.  (*Id.*).

At step three, the ALJ concluded that Giza did not have an impairment or combination of impairments severe enough to meet or equal a listing.  (AR 44).  The ALJ then assigned Giza the following residual functional capacity ("RFC"):

> [T]he claimant has the residual functional capacity to perform light work, as defined in 20 CFR 404.1567(b) and 416.967(b), except she is limited to: occasionally climb ramps and stairs but never ladders, ropes, or scaffolds; occasionally balance, stoop, kneel,

---

[2] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite her limitations.  20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a).  The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of.  20 C.F.R. §§ 404.1520(e), 416.920(e).

crouch, and crawl; frequently use the bilateral upper extremities to
handle, finger, and feel; and tolerate occasional exposure to
extreme heat, extreme cold, humidity, wetness, fumes, odors,
gases, and areas of poor ventilation.

(AR 45).

The ALJ found at step four that Giza was able to perform her past relevant work as an
office clerk. (AR 48). Additionally, the ALJ found in the alternative at step five that given her
age, education, work experience, and RFC, Giza could perform unskilled, light-exertional jobs
that exist in substantial numbers in the national economy including office helper, mail clerk, and
storage rental clerk. (ECF 49-50). As such, Giza's applications for DIB and SSI were denied.
(AR 50).

### C. Medical Opinion Evidence

Giza first argues that the ALJ impermissibly substituted her own medical opinion over
that of Giza's treating physician. (ECF 16 at 10). More specifically, Giza takes issue with the
ALJ's evaluation of the opinion of her treating neurologist Ender Akan, M.D.—who opined that
Giza would require postural and exertional accommodations such as being allowed to elevate her
legs and lie down. (AR 2560-63). In her final decision, the ALJ found Dr. Akan's opinion to be
unpersuasive because it was based on Giza's self-reported complaints and was supposedly
inconsistent with Dr. Akan's own treatment notes and the medical record as a whole. (ECF 16 at
11-12 (citing AR 47-48)).

Giza asserts that the medical record is in fact consistent with Dr. Akan's proposed
accommodations, and that the ALJ "played doctor" by substituting her own opinion for that of
Dr. Akan and by "cherry-picking" information to support that opinion while ignoring contrary
evidence. (*Id*. at 12-14). Further, Giza claims that the ALJ failed to build a "logical bridge"

between the evidence in the record regarding Giza's strength and gait, and her rejection of Dr. Akan's opinion.  (*Id*. at 14-16).  Finally, Giza attacks the ALJ's finding that Dr. Akan's opinion was inconsistent with her "reported daily activities," arguing that Giza's limited activities are not substantial evidence of her ability to perform light work in a competitive setting.  (*Id.* at 16-19 (citing AR 48)).  For the following reasons, Giza's arguments—specifically as to the treatment of Dr. Akan's opinion and Giza's daily activities—are persuasive.

Under the prior regulations, "more weight [was] generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances."  *Clifford*, 227 F.3d at 870 (citations omitted); *see* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  This so called "treating physician rule," however, was eliminated for claims— such as Giza's—filed after March 27, 2017.  *McFadden v. Berryhill*, 721 F. App'x 501, 505 n.1 (7th Cir. 2018).  "Opinion evidence is now governed by 20 C.F.R. §§ 404.1520c [and] 416.920c (2017)."  *Id.*  When considering the persuasiveness of any medical opinion, an ALJ now must consider the following factors:  supportability; consistency; relationship with the claimant, including the length of the treatment relationship, frequency of examination, purpose of the treatment relationship, extent of the treatment relationship, and examining relations; specialization; and any other factors that tend to support the medical opinion, including evidence that the medical source is familiar with other medical evidence or has an understanding of social security policies.  *See Inmam v. Saul*, No. 1:20-CV-231 DRL, 2021 WL 4079293, at *2 (N.D. Ind. Sept. 7, 2021).

"The regulations state that supportability and consistency are the most important factors to consider, and that the other three factors only require discussion if it is appropriate for the determination."  *Etherington v. Saul*, No. 1:19-CV-475-JVB-JPK, 2021 WL 414556, at *3 (N.D.

6

Ind. Jan. 21, 2021), *R. & R. adopted by Bart E. v. Saul*, No. 1:19-CV-475-JVB-JPK, 2021 WL

411440 (N.D. Ind. Feb. 5, 2021). "Supportability" means that "[t]he more relevant the objective

medical evidence and supporting explanations presented by a medical source are to support his

or her medical opinion or prior administrative medical finding(s), the more persuasive the

medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. §§

404.1520c(c)(1), 416.920c(c)(1). "Consistency," on the other hand, means that "the more

consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence

from other medical sources and nonmedical sources in the claim, the more persuasive the

medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. §§

404.1520c(c)(2), 416.920c(c)(2).

An ALJ cannot "cherry-pick" evidence supporting one outcome, while failing to address

evidence that would undercut her determination. *Etherington*, 2021 WL 414556, at *4; *see also*

*Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013); *Garfield v. Schweiker*, 732 F.2d 605, 609

(7th Cir. 1984). In other words, while the ALJ is free to weigh conflicting opinion evidence, *see*

*Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004), "[she] may not ignore entire lines of

contrary evidence," *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012) (collecting cases). At the

same time, "[w]hen an ALJ denies benefits, [she] must build an accurate and logical bridge from

the evidence to [her] conclusion, and [she] may not 'play doctor' by using [her] own lay opinions

to fill evidentiary gaps in the record." *Chase v. Astrue*, 458 F. App'x 553, 556-57 (7th Cir. 2012)

(citations and internal quotation marks omitted).

In February 2019, Dr. Akan completed a physical impairment questionnaire noting that

Giza's pain and other symptoms would constantly interfere with her attention and concentration.

(AR 2560). He reported that she would not be able to sit or stand an hour or more during an

eight-hour workday. (AR 2561). According to Dr. Akan, Giza would need to elevate her legs at heart-level at least eighty percent of a workday and would frequently need to lie down and take unscheduled rest breaks every thirty minutes. (AR 2562-63). Finally, Dr. Akan opined that Giza would only be able to frequently reach, handle, or finger. (AR 2563).

While the ALJ found that Dr. Akan's manipulative limitations were consistent with the record as a whole, she also determined that:

> Dr. Akan's opinion regarding the claimant's exertional and postural functioning, accommodations to lie down and elevate the legs during the workday, and the need to take unscheduled rest breaks is based heavily on the claimant's self-reported complaints rather than objective medical findings. These proposed limitations are not supported by Dr. Akan's treatment records from 2018, 2018 [sic], and 2019, which consistently document intact motor strength and sensation in the upper and lower extremities, a normal gait pattern, and no swelling in the extremities. Furthermore, Dr. Akan's opinion is not persuasive because it is inconsistent with the record as a whole, such as the claimant's reported daily activities and diagnostic test reports, which establish that the claimant retains the capacity to perform a reduced range of light work.

(AR 47-48 (citations omitted)). In support of this conclusion, the ALJ cited to Dr. Akan's treatment notes tending to show lack of edema, normal lower-extremity strength, and normal gait. (AR at 47 (citing 2596-97 ("Motor Strength: . .  lower extremities 5 out of 5 . . . .[n]ormal station and gait . . . . no cyanosis, clubbing, or edema"), 2606 (same), 2615-16 (same), 2625-26 (same), 2637 (same), 2647-48 (same), 2656-57 (same))).

Giza points out, though, that there are multiple instances in the record that support or are consistent with Dr. Akan's limitations. For example, the Commissioner's own consultive examiner R. Gupta, M.D., opined that despite normal lower extremity strength, normal gait, full spinal range of motion, and negative bilateral straight-leg tests, "[Giza] has difficulty doing work related activities such as sitting, standing, walking, lifting, carrying and handling objects due to

pain, numbness and tingling sensations in bilateral lower extremities." (AR 705-06). While the ALJ cited the same treatment notes from Dr. Akan in discounting Dr. Gupta's opinion as inconsistent with the record, at no point did the ALJ reference Dr. Akan's notes which would seemingly support his and Dr. Gupta's assessments. (AR 47). For example, on February 5, 2019, Dr. Akan recorded that Giza had "continued bilateral extremity edema" and "[c]laudication of both lower extremities . . . ." (AR 2654, 2657). Indeed, Dr. Akan consistently found claudication of both lower extremities and diabetic polyneuropathy associated with diabetes mellitus. (*See, e.g.,* AR 2588, 2593, 2597, 2598, 2603, 2607, 2616, 2617, 2623, 2626, 2637, 2648, 2653). Further, lower extremity edema was noted by other medical providers throughout the record. (*See, e.g.,* AR 864, 887, 978, 982, 1020, 1052). Still more, the ALJ accepted the opinion of Giza's pulmonologist Don Dumont, M.D.—which she characterized as "persuasive because it is consistent with the record as a whole" (AR 48)—but seemingly ignored Dr. Dumont's opinion that Giza could not walk one city block or more without rest or severe pain due to leg cramps (AR 2661).

The ALJ also does not explain how Dr. Akan's proposed accommodations are inconsistent with his own treatment notes. *See Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015) ("Internal inconsistencies may provide good cause to deny controlling weight to a treating physician's opinion, but the reasoning for the denial must be adequately articulated."); *see also Ramirez v. Saul*, No. SA-20-CV-00457-ESC, 2021 WL 2269473, at *4 (W.D. Tex. June 3, 2021) ("Because the ALJ failed to articulate any reason for departing from the [state agency medical consultants'] opinions that Plaintiff can only engage in standing and walking for four or five hours in a given workday, the ALJ failed to properly apply Section 404.1520c in evaluating the persuasiveness of these medical opinions of record."); *Buege v. Saul*, No. 20-CV-1097-TMP,

2021 WL 2822043, at *6 (W.D. Tenn. July 7, 2021) ("[D]espite the new standards being more relaxed than their predecessors, an ALJ must still provide a coherent explanation of his [or her] reasoning in analyzing each medical opinion." (citation and internal quotation marks omitted)).

The ALJ premises her conclusion in part on the supposed lack of "objective medical findings" (AR 47), but even without such evidence Drs. Akan, Gupta, and Dumont all suggested that Giza would have difficulty standing or walking due to pain (*see* AR 706, 2560, 2661). Further, Giza consistently alleged—and her medical providers consistently treated her for—pain when walking or standing.  "[A]s countless cases recognize, the etiology of extreme pain is often unknown, and can be severe and disabling even in the absence of 'objective' medical findings demonstrating a physical condition that normally causes pain of the severity claimed by the applicant." *Cauley v. Berryhill*, 312 F. Supp. 3d 746, 759 (N.D. Ind. 2018) (citing *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004)).  Indeed, even normal gait and muscle strength are not necessarily inconsistent with claims of debilitating pain.  *See Adaire v. Colvin*, 778 F.3d 685, 688 (7th Cir. 2015) ("The administrative law judge said that Adaire was seen to be able to move around 'with ease and had a normal gait.'  In other words, he does not limp.  She didn't explain why, if the applicant's evidence of pain were truthful, it would imply that he limps."); *Otis S. v. Saul*, 1:18-CV-372-WCL-JPK, 2019 WL 7669923, at *3 (N.D. Ind. Dec. 19, 2019) ("An ALJ's independent reliance on a claimant's muscle strength to depart from a medical opinion regarding such limitations therefore suggests an improper tendency to 'play doctor.'").

In terms of supportability, there is some objective medical evidence that seems to support Dr. Akan's opinion.  Specifically, a December 9, 2016, MRI ordered by Giza's primary care physician, Suganthi Vijayaraj, M.D., shows mild facet arthropathy at L1-2 through L3-4; disc bulging/mild to moderate fact arthropathy with mild central canal/bilateral foraminal narrowing

10

at L4-5; and mild disc bulging/facet arthropathy with mild bilateral foraminal narrowing at L5-S1, suggesting lumbar spondylosis without high-grade spinal stenosis.  (AR 474).  Further, a 2017 EMG showed "mild mixed sensory motor peripheral polyneuropathy" (AR 2604), which could be consistent with Dr. Akan's opinion regarding the effects of Giza's pain.  *See Nightingale Home Healthcare, Inc. v. Anodyne Therapy, LLC*, No. 1:06-CV-1435-SEB-JMS, 2008 WL 4367554, at *1 (S.D. Ind. Sept. 18, 2008) ("Peripheral neuropathy can often be a circular process:  degeneration of the nerves that control the blood vessels cause the vessels to constrict, the decreased blood flow irritates the nerves causing pain and further degeneration, which results in more pain, numbness, and atrophy." (citing 4 J.E. Schmidt, *Attorneys' Dictionary of Medicine and Word Finder,* pp.-90 and P-181 to P-182 (2007))).

The ALJ's conclusion that the "diagnostic test reports . . . establish that the claimant retains the capacity to perform a reduced range of light work" including "occasionally balanc[ing], stoop[ing], kneel[ing], crouch[ing], and crawl[ing]" is also problematic.  (AR 45, 48).  While the ALJ cited to objective medical tests such as the 2016 MRI, 2017 EMG, and a pulmonary stress test (AR 48 (citing AR 779, 2599)), there is no indication of how she determined the results of these tests are inconsistent with Dr. Akan's—or for that matter, Dr. Gupta's—opinions regarding Giza's need of postural or exertional accommodations.

The only other opinion evidence discussed by the ALJ regarding Giza's physical impairments were those offered by the non-examining state physicians, J. Sands, M.D., and Joshua Eskonen, D.O., who each made no functional assessments because they considered Giza's impairments to be non-severe.  (AR 47; *see* AR 106-07, 114-15).  The ALJ, however, found those opinions to be unpersuasive because they did not review the treatment records introduced at the hearing level which established that Giza's "lumbar degenerative disc disease,

diabetes mellitus with diabetic neuropathy, carpal tunnel syndrome, and chronic obstructive

pulmonary disease, obstructive sleep apnea, and restless leg syndrome are severe medically

determinable impairments."  (AR 47).  At no point did the ALJ cite to any medical expert who

opined that Giza retained the ability to perform light work with the accommodations provided for

in the RFC.  *See Clifford*, 227 F.3d at 870 ("[T]he ALJ did not cite to any medical report or

opinion that contradicts Dr. Combs's opinion.  In effect, the ALJ substituted his judgment for

that of Dr. Combs . . . .  That was error.").

       By rejecting the opinions of Drs. Sand, Eskonen, Akan, and Gupta—and not fully

addressing Dr. Dumont's opinion—the ALJ created an evidentiary deficit.  While the

determination of an RFC is reserved to the ALJ, "ALJs are required to rely on expert opinions

instead of determining the significance of particular medical findings themselves."  *Moon v.*

*Colvin*, 763 F.3d 718, 722 (7th Cir. 2014); *see also McHenry v. Berryhill*, 911 F.3d 866, 871 (7th

Cir. 2018) ("An ALJ may not conclude, without medical input, that a claimant's most recent

MRI results are 'consistent' with the ALJ's conclusions about her impairments."); *Eric H. v.*

*Saul*, No. 18 C 6382, 2020 WL 3100642, at *3 (N.D. Ill. June 11, 2020) ("He acknowledged that

the objective medical evidence was contrary to the various consultants' conclusions that Plaintiff

had zero functional limitations, or that he could work at the medium exertional level with slight

additional postural limitations, but he erred by offering no medical opinion that would support a

finding that Plaintiff could work at the light level.").  In other words, the ALJ failed to articulate

what evidence "provide[s] support for her opinion" and thus the Court is left guessing "whether

there is support for the RFC determination" or if she "fabricate[d] [the RFC] out of whole cloth."

*Betts v. Colvin*, No. 13-cv-6540, 2016 WL 1569414, at *3 (N.D. Ill. Apr. 19, 2016); *see Larson*

*v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) ("No doctor concluded that Larson's symptoms

were just a response to situational stressors as opposed to evidence of depression.  The ALJ's conclusion to the contrary thus finds no support in the record.").

Finally, the ALJ's reference to Giza's daily activities does not save her treatment of Dr. Akan's opinion evidence.  While the ALJ asserted that Dr. Akan's opinion was inconsistent with Giza's reported daily activities (AR 48), the only reported daily activities the ALJ considered were Giza's ability to cook meals on a daily basis, shop on a weekly basis, do laundry on a twice weekly basis, mow the lawn, drive a car, play computer games, and take care of personal needs such as grooming (AR 46 (citing AR 314-320)).

Again, though, the ALJ did not address evidence of Giza's daily activities that did not support her conclusion.  The ALJ, for example, did not reference Giza's husband's adult function report which noted that Giza cannot "work many hours," needs assistance carrying laundry up and down stairs, and has back pain as a result of bending and standing.  (AR 306-11).  Nor did the ALJ consider Giza's hearing testimony that she could only sit about fifteen minutes before needing to stand up, and then could only stand for about ten to fifteen minutes, due to pain.  (AR 75, 84, 87).  Also lacking is any discussion of Giza's testimony that she could only prepare "simple meals" due to her back pain, needs to take breaks when doing chores, and sometimes needs her son or husband's help to finish them.  (AR 91-92).  In her own function report, Giza alleged that she could only lift between five and ten pounds without stomach or back pain and claimed that "every day [was] a struggle . . ."  (AR 319, 321).

Further, as discussed in greater detail *infra* regarding the ALJ's credibility determination, the ALJ does not explain how exactly Dr. Akan's opinion is inconsistent with Giza's daily functioning.  *See Clifford*, 227 F.3d at 870 ("Here, the ALJ stated that Clifford's description of her daily activities did not appear to preclude 'all competitive work.'  In support of this

13

contention, the ALJ noted that Clifford walks six blocks, performs household chores, and shops.

According to the ALJ, these activities were inconsistent with Dr. Combs's opinion regarding

Clifford's limitation on performing work that requires standing or walking. . . . The ALJ did not

provide any explanation for his belief that Clifford's activities were inconsistent with Dr.

Combs's opinion and his failure to do so constitutes error."); *see also Mendez v. Barnhart*, 439

F.3d 360, 362 (7th Cir. 2006) ("[The Seventh Circuit Court of Appeals has] cautioned the Social

Security Administration against placing undue weight on a claimant's household activities in

assessing the claimant's ability to hold a job outside the home." (collecting cases)).  On the

contrary, Giza's hearing testimony, and both her and her husband's function reports, suggest that

Giza completed her daily activities with the accommodations akin to those suggested by Dr.

Akan—namely, frequent breaks, changes in posture to relieve pain, and assistance from others.

*Compare Spiva v. Astrue*, 628 F.3d 346, 352 (7th Cir. 2010) ("[The ALJ] didn't mention the

evidence that Spiva's performance of household chores was incompetent; as the aunt with whom

he had lived for a time stated, he needed help with everything because 'his mind runs a lot.'");

*Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir. 2005) ("Uncontested evidence not mentioned by

the administrative law judge reveals that she performs these chores with difficulty, and with the

aid of her sister, a neighbor, and another woman.").

　　　In summary, the Court cannot say that the ALJ built a logical bridge between her

treatment of Dr. Akan's opinion evidence and the record.  While the ALJ was not required to

consider all the evidence in the medical records, she was not free to "ignore entire lines of

contrary evidence."  *Arnett*, 676 F.3d at 592.  Here, the ALJ failed to address evidence within Dr.

Akan's treatment notes and from other medical sources which was consistent with his opinion, as

well as medical findings that supported his opinion.  Further, the ALJ did not explain how the

evidence which she did cite—including diagnostic tests and Giza's own daily activities—were inconsistent with Dr. Akan's opinion.  Finally, to the extent that the ALJ interpreted Giza's objective medical evidence—while rejecting or failing to address the medical opinions in the record—she impermissibly "played doctor."  Accordingly, remand is required.  While the Court could stop there, in the interest of completeness it will consider Giza's remaining two arguments.

### D.  Credibility Determination

Giza next takes issue with the ALJ's treatment of her testimony regarding the intensity, persistence, and limiting effects of her symptoms.  In that regard, the ALJ stated:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.
>
> As for the claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms, they are inconsistent because the evidence within the record establishes that the claimant retains the capacity to perform a reduced range of light work.

(AR 45-46).  Giza argues that by finding her symptom testimony to be "not entirely consistent" with the medical evidence, the ALJ applied the incorrect legal standard.  (ECF 16 at 20-21).  In any event, she argues, the ALJ failed to build a logical bridge between the evidence and her conclusion regarding her symptom testimony.  (*Id.* at 21-23).  Once again, Giza's arguments are persuasive.

As an initial matter, the Seventh Circuit has criticized "not entirely consistent" phraseology like that used here as "meaningless boilerplate."  *See Hostetter v. Saul*, 841 F.

15

App'x 983, 986-87 (7th Cir. 2021) (citing *Parker v. Astrue*, 597 F.3d 920, 921-22 (7th Cir.

2010)).  The use of boilerplate language alone, though, does not necessitate remand.

> While the ALJ's boilerplate language does not match the statutory
> standard, an ALJ's evaluation of subjective symptoms will be
> upheld unless it is patently wrong.  Moreover, under SSR 16-3p . .
> ., the ALJ must "evaluate whether the statements are consistent
> with the objective medical evidence and the other evidence."
> Therefore, the use of the language "not entirely consistent" is not,
> by itself, a basis for remand.

*Blackwell v. Berryhill*, No. 2:17-cv-00460-JVB-APR, 2019 WL 1397476, at *5 (N.D. Ind. Mar.

27, 2019) (citations omitted); *see also Joyce W. v. Berryhill*, No. 2:18-cv-104-JVB-JEM, 2019

WL 2353500, at *5 (N.D. Ind. June 3, 2019); *Torres v. Berryhill*, No. 2:17-cv-393, 2019 WL

2265367, at *6 (N.D. Ind. May 28, 2019).  Indeed, "[t]he 'not entirely consistent' language is . . .

a problem . . . only if the ALJ does not identify and explain the relevant inconsistencies or other

reasons for discounting the subjective complaints."  *Hostetter*, 841 F. App'x at 986-87 (citing

*Plessinger v. Berryhill*, 900 F.3d 909, 916 (7th Cir. 2018)).  Accordingly, the Court will turn to

the substance of Giza's challenge.

Generally, the Court will "overturn an ALJ's adverse credibility determination only if it

is unsupported by substantial evidence or rests on legally improper analysis."  *Lambert v.*

*Berryhill*, 896 F.3d 768, 777 (7th Cir. 2018) (citing *Ghiselli v. Colvin*, 837 F.3d 771, 778-79 (7th

Cir. 2016)).  An ALJ's determination as to credibility "must contain specific reasons for the

finding on credibility, supported by the evidence in the case record, and must be sufficiently

specific to make clear to the individual and to any subsequent reviewers the weight the

adjudicator gave to the individual's statements and the reasons for that weight."  *Norris v.*

*Astrue*, 776 F. Supp. 2d 616, 632 (N.D. Ill. 2011) (citing SSR 96-7P, 1996 WL 374186, at *2

(July 2, 1996)); *see also* SSR 16-3P, 2017 WL 5180304, at *10 (Oct. 25, 2017) (superseding

SSR 96-7P) ("The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.").

Ultimately, though, the Court cannot say that the ALJ adequately explained how she reached her credibility determination.  First and foremost, for many of the same reasons already discussed, it is not clear how Giza's subjective allegations are inconsistent with the medical evidence in the record.  Again, the record contains numerous references to Giza's lower extremity edema, claudication, and neuropathy that the ALJ either "not credited or simply ignored."  *Zblewski v. Schweiker,* 732 F.2d 75, 79 (7th Cir. 1984).  Further, while "the claimant bears the burden of showing by medical evidence that he/she is disabled," *Mables v. Sullivan*, 812 F. Supp. 886, 888 (C.D. Ill. 1993) (collecting cases), the ALJ was not free to interpret objective medical findings and no medical provider cited by the ALJ suggested that Giza's symptoms did not match her subjective allegations.  As already discussed, three medical sources suggested the need for some sort of postural or exertional limitations in relation to Giza's ability to walk and stand.  Without the aid of an expert, the ALJ was not permitted to interpret the objective medical evidence otherwise.

The ALJ tried to bolster her credibility determination by stating that Giza's "treatment [was] successful in managing the severity of [her] symptoms," pointing specifically to her 2017 epidural steroid injection and medial branch block injection and her pain medication.  (AR 46). But as the ALJ noted, Giza testified that treatment resulted in "little relief of her pain."  (AR 45). Indeed, the medical records reflect that after the steroid injection she "did not retain pain [relief]."  (AR 2571).  Still more, while Giza received "80-100% pain relief" from the medial

17

branch block injection, the relief was limited to "the length of time concordanent [sic] to the medications used." (AR 2564).

Giza also continued to consistently report leg pain, leg cramps, and numbness following both injections. (*See, e.g.,* AR 520, 523, 736, 2626, 2634, 2645). Further, multiple medical providers continued to prescribe pain medications such as gabapentin and Lyrica. (AR 359, 2597, 2606, 2648, 2647). Such evidence tends to support rather than detract from Giza's claims. *See Lambert*, 896 F.3d at 777 (discounting the ALJ's opinion that the claimant's condition improved with treatment when "records actually show[ed] that these treatments were ineffective at either consistently or decisively improving [the claimant's] chronic pain or resolving his functional limitations"); *see also* SSR 16-3p, 2017 WL 5180304, at *9 ("Persistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications, trying a variety of treatments, referrals to specialists, or changing treatment sources may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent."). As such, the ALJ's reasoning does not withstand judicial scrutiny in this regard. *See Gipson v. Colvin*, Case No. 16–C–0865, 2017 WL 120918, at *6 (E.D. Wis. Jan. 12, 2017) (finding the ALJ's conclusion that the claimant's condition improved with conservative treatment did not withstand scrutiny when the record revealed multiple instances where epidural injections and physical therapy only provided partial or temporary relief).

The ALJ also discounted Giza's subjective allegations because her "medical records document a pattern of noncompliance with diabetic and respiratory medication as well as nonparticipation with physician recommended treatment such as following a diabetic diet and smoking cessation, which is inconsistent with the alleged severity of the claimant's symptoms." (AR 46). This reasoning, too, is not without issue. In general, an ALJ should "not find an

18

individual's symptoms inconsistent with the evidence in the record on this basis without

considering possible reasons he or she may not comply with treatment or seek treatment

consistent with the degree of his or her complaints."  SSR 16-3p, 2017 WL 5180304, at *9.  Said

another way, "an ALJ must not draw inferences about a claimant's lack of treatment without

exploring the reasons for the inaction."  *Ray v. Berryhill*, 915 F.3d 486, 490-91 (7th Cir. 2019);

*see Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012) ("An ALJ may need to question the

individual at the administrative proceeding in order to determine whether there are good reasons

the individual does not seek medical treatment or does not pursue treatment in a consistent

manner." (citation and internal quotation marks omitted)).

At the hearing the ALJ did not question Giza about her failure to follow through with

medication.  (*See* AR 63-101).  The record, though, is replete with examples of Giza being

unable to continue or obtain medications due to lack of insurance or cost.  (*See, e.g.,* AR 652

("[Giza] is off Lyrica due to cost."), 1121 ("Patient called and said she is having problems with

her insurance and they are not covering her medications at this time and her medications are

really expensive.  She is asking for samples of anything that might help her.").

Further, while 20 C.F.R. § 404.1530(a) and 20 C.F.R. § 416.930(a) contemplate the

denial of benefits for failure to follow a prescribed treatment, "[e]ssential to a denial of benefits

pursuant to Section[s] 404.1530 [and 416.930] is a finding that if the claimant followed her

prescribed treatment she could return to work."  *Shramek v. Apfel*, 226 F.3d 809, 812 (7th Cir.

2000) (quoting *Rousey v. Heckler*, 771 F.2d 1065, 1069 (7th Cir.1985)).  While Dr. Dumont did

note that Giza's condition would get worsen if she continued to smoke (AR 2661), "the ALJ here

made no finding that the prescribed treatment would restore her ability to work, and the record

would not in fact support such a finding.  In addition, no medical evidence directly linked her

19

pain or swelling to her smoking." *Shramek*. 226 F.3d at 813.  In any event, "[g]iven the addictive nature of smoking, the failure to quit is as likely attributable to factors unrelated to the effect of smoking on a person's health." *Id.*  As such, it "is an unreliable basis on which to rest a credibility determination." *Id.*

Finally, the ALJ discounted Giza's subjective allegations concerning the intensity and persistence of her pain because, "the record reveals that [she] is able to engage in a level of daily activity and interaction that supports the ability to perform a reduced range of light work."  (AR 46).  But as already discussed, the ALJ fails to explain how Giza's activities are consistent with light work and fails to consider the full context of how they were performed.  *See Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) ("Although [the ALJ] briefly described Villano's testimony about her daily activities, he did not, for example, explain whether Villano's daily activities were consistent or inconsistent with the pain and limitations she claimed."); *Craft v. Astrue*, 539 F.3d 668, 680 (7th Cir. 2008) ("The ALJ ignored Craft's qualifications as to *how* he carried out those activities:  Craft's so-called 'daily walk' was merely to the mailbox at the end of the driveway, his vacuuming took only four minutes, and his grocery shopping was done on a motorized cart at the store and he was able to carry only one grocery bag in each hand into the house. . . . Unless the ALJ properly finds Craft's testimony to be incredible on remand, any such testimony about how Craft copes with his daily activities should be considered in the RFC assessment."); *Zurawski*, 245 F.3d at 887 ("While the ALJ did list Zurawski's daily activities, those activities are fairly restricted (*e.g.*, washing dishes, helping his children prepare for school, doing laundry, and preparing dinner) and not of a sort that necessarily undermines or contradicts a claim of disabling pain."); *see also Clifford*, 227 F.3d at 872 (noting "minimal daily activities . . . do not establish that a person is capable of engaging in substantial physical activity").

In sum, the Court once again cannot say that the ALJ's decision is based on substantial evidence or that the ALJ built a logical bridge from the evidence to the conclusion.  While it is Giza's burden of providing evidence of her disability, the ALJ is not free to interpret the medical record without expert assistance.  Accordingly, the ALJ has not explained how the intensity, persistence, and limiting effects of Giza's alleged symptoms are inconsistent with the medical record.  Further, the ALJ failed to consider alternative reasons for Giza's failure to seek and continue medical treatment, as required by the Commissioner.  Finally, the ALJ failed to explain how Giza's daily activities are inconsistent with her alleged symptoms.  Accordingly, remand is also required on these grounds.

### E.  VE Hypothetical

Giza's final argument stems from the hypothetical questions asked by the ALJ to the VE at the hearing.  The ALJ first asked the VE to:

> [A]ssume a hypothetical individual closely approaching advanced age, high school education, past relevant work as described.  Has the residual functional capacity to perform light work as defined in the Regulations, except occasionally climb ramps and stairs, never climb ladders, ropes and scaffolds, occasionally balance stoop, kneel, crouch and crawl.  No more than occasional exposure -- can tolerate occasional exposure to extreme heat and cold, humidity, wetness, fumes, odors, dusts, [gasses] and poor ventilation.  Would such an individual be able to perform her past relevant work?

(AR 93).  The VE responded that such a person could perform Giza's past relevant work as an office clerk, but could also work as an office helper, mail clerk, storage rental clerk, and sorter. (AR 92-93).  Upon another question, the VE stated a similar individual who could frequently use her upper extremities to handle, finger, and feel could perform the same jobs.  (AR 94). Referencing Dr. Akan's medical source statement, the ALJ asked the VE to consider a hypothetical individual who could sit one hour during an eight-hour workday, stand one hour,

21

occasionally lift five pounds, and be absent from work two or three times a month.  (AR 96-97).

The VE ruled out any work for such an individual in the national economy.  (AR 97).  Finally

Giza's attorney also asked the VE to consider an individual with the same limitations noted in

the initial hypothetical, but to also assume that the "individual would need to frequently lie down

every 30 minutes throughout the workday. . . ."  (AR 98).  The VE testified such a limitation

would be preclusive of employment.  (*Id.*).

Giza primarily argues that the ALJ erred by failing to include a limitation reflecting her

inability to walk a block due to leg cramps, based on Dr. Dumont's opinion which—again—the

ALJ found persuasive but did not discuss.  (ECF 16 at 24; *see* AR 48).  She further alleges that if

she were "limited to sedentary level work (or less) as suggested by Dr. Dumont and opined by

Dr. Akan, then given her age, education and lack of transferable skills (see [AR] 97-98), a

finding of disabled would be directed by Rule 201.14 of the Medical-Vocational Guidelines."

(ECF 16 at 24).  Finally, she asserts that because "Dr. Akan's opinions are well supported by the

evidence . . . the ALJ erred in failing to adopt the VE's testimony that there are no jobs Mrs.

Giza could perform that are consist[ant] with her actual residual functional capacity."  (*Id.* at 24-

25).

"When an ALJ poses a hypothetical question to a vocational expert, the question must

include all limitations supported by medical evidence in the record."  *Stewart v. Astrue*, 561 F.3d

679, 684 (7th Cir. 2009) (collecting cases).  "The reason for the rule is to ensure that the

vocational expert does not refer to jobs that the applicant cannot work because the expert did not

know the full range of the applicant's limitations."  *Steele v. Barnhart*, 290 F.3d 936, 942 (7th

Cir. 2002).  An ALJ, however, only needs to include "those impairments that [she] found were

medically determinable and supported by the evidence."  *Monhollen v. Berryhill*, No. 1:17-CV-245-TLS, 2018 WL 2901100, at *4 (N.D. Ind. June 11, 2018).

Here, the ALJ's treatment of the hypothetical concerning Dr. Akan's opinion is not in and of itself an error.  As mentioned, the ALJ found Dr. Akan's opinion to be unsupported by the medical evidence.  (AR 47-48).  But while the Court has already explained at length how the ALJ failed to adequately support her conclusion, she was not required to include limitations in her hypothetical that she did not believe were supported by the evidence.  *See Sims v. Barnhart*, 309 F.3d 424, 432 (7th Cir. 2002) ("The ALJ did not err in relying on that testimony because it reflected Sims's impairments to the extent that the ALJ found them supported by the evidence in the record.").

The ALJ's treatment of Dr. Dumont's opinion, however, is more concerning as she found his report persuasive and consistent with the record.  (AR 58); *see Young,* 362 F.3d at 1004 ("Even accepting the ALJ's decision to give limited weight to Dr. Varvil–Weld's testing and evaluation, the hypothetical questions failed to include all of the limitations supported by the medical evidence in the record from the other experts whose assessments the ALJ did credit."); *compare Monhollen*, 2018 WL 2901100, at *4 ("[The ALJ] properly included in the hypothetical only those impairments that he found were medically determinable and supported by the evidence.").  As such, remand is necessary on these grounds as well.

To sum it up, the ALJ did not necessarily err when not accounting for the VE's response to her hypothetical including limitations she believed were not supported by the record.  To the extent, though, that the ALJ found the limitations opined by Dr. Dumont persuasive and supported by the record, she should have included them in her hypothetical.

23

## IV.  CONCLUSION

For the foregoing reasons, the Commissioner's decision is REVERSED and the case is REMANDED to the Commissioner for further proceedings in accordance with this Opinion and Order.[3]  The Clerk is DIRECTED to enter a judgment in favor of Giza and against the Commissioner.

SO ORDERED.

Entered this 5th day of October 2021.

/s/ Susan Collins
Susan Collins
United States Magistrate Judge

---

[3] While Giza primarily argues that this matter should be reversed and remanded, she also in passing suggests that "[r]eversal, and a fully favorable award, are . . . appropriate." (ECF 16 at 25).  "[A]n award of benefits," however, "is appropriate only if all factual issues have been resolved and the record supports a finding of disability." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 356 (7th Cir. 2005) (citations omitted); *see also Bray v. Astrue*, No. 2:10-CV-00352, 2011 WL 3608573, at *10 (N.D. Ind. Aug. 15, 2011).  The record here does not "yield but one supportable conclusion" in Giza's favor.  *Briscoe ex rel. Taylor*, 425 F.3d at 355 (citation omitted).  Rather, the ALJ failed to adequately explain her treatment of the medical evidence and her credibility determination.  Accordingly, further proceedings are necessary.